OSCN Found Document:LEFTWICH V. STATE

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 LEFTWICH V. STATE
2015 OK CR 5
Case Number: F-2013-1156
Decided: 05/22/2015
Cite as: 2015 OK CR 5, __ __

 

 






OPINION





SMITH, PRESIDING JUDGE:



¶1 Deborah Ann Leftwich was tried by bench trial and convicted of Count II, Soliciting and/or Accepting a Bribe from Another for Withdrawal of Candidacy in violation of 26 O.S.2001, § 16-108, in the District Court of Oklahoma County, Case No. CF-2010-8067.[1] The Honorable Cindy H. Truong sentenced Leftwich to one (1) year imprisonment, suspended, with the provision that she is prohibited from running for office in the State of Oklahoma or seeking employment with the State. Leftwich waived for appeal all issues except the legal issues surrounding the terms "candidate" and "withdraw". Leftwich appeals from this conviction and sentence, and raises three propositions of error in support of her appeal.


¶2 Leftwich, a Democrat, represented Senate District 44 in the Oklahoma State Senate, serving a term which ended in November 2010. After her election in 2006, Leftwich filed a statement of candidacy for the 2010 election cycle with the Ethics Commission and created a candidate committee for her reelection to her Senate seat. From 2007 through 2010, Leftwich solicited contributions for and made expenditures from her campaign fund for her reelection campaign; over the course of that time she raised about $110,000.00. As late as April 2010, she authorized and attended a fundraiser for her campaign. However, on May 28, 2010, the last day of the legislative session, Leftwich issued a press release announcing that she would not run for reelection in 2010. This prosecution is the consequence of the actions which preceded that announcement. Both defendants below argued that their actions were part of the normal, messy legislative process. After a thorough review of the record, we agree with the preliminary hearing magistrate that "when the evidence is looked at as a whole in this matter in its entirety, it is clear this exceeds business as usual."


¶3 Before her election to the Senate, Leftwich worked for several years in an administrative capacity for the state Medical Examiner's office. Under the retirement plan for state workers, one's average annual salary, on which retirement benefits are based, is calculated by using the highest three years' salary of the last ten years the employee worked for the State. Retirement benefits are for a lifetime. Leftwich made approximately $38,000.00 per year as a state Senator. Anyone interested in calculating potential retirement benefits may contact an employee of the Oklahoma Public Employees Retirement System (OPERS), or may use an online calculator available on the OPERS website. For this trial, Rebecca Catlett of OPERS was asked to calculate Leftwich's potential retirement benefits in three different circumstances. Leftwich's actual retirement benefits, based on her decision not to run for reelection in 2010, were $1,920.00 per month. Had she run for reelection in 2010, won, and served another four years in the Senate, her retirement benefits would have been $2,240.00 per month. Had she retired from the Senate in 2010 and taken a position with the State for three years at a salary of $80,000.00 per year, her retirement benefits would have been $3600.00 a month. The last option represents an 87.5% increase over her regular retirement sum, and a 60.7% increase over the benefits from serving another term in Senate.


¶4 By 2010, the Medical Examiner's office was in serious disarray. It had lost accreditation, had outgrown its outmoded facility, and had lost several agency heads and employees in a short amount of time. Governor Henry had commissioned a report on the office, known as the Cline Report; the legislature had also studied the agency. Senate Bill 738, which proposed reforms for the office, was introduced in 2009. Fixing the Medical Examiner's office was a priority, and SB 738 was a leadership bill, meaning that it was sponsored by the President Pro Tem of the Senate and the Speaker of the House. The bill did not pass in 2009 and was reintroduced in 2010. Senator Anthony Sykes handled the bill for the Pro Tem in the Senate, and Representative Randall Terrill handled it for the Speaker of the House. As initially introduced in 2010, SB 738 changed the characteristics of the Board governing the Medical Examiner's office, made other administrative changes, and provided that the office should move to a newly constructed building in Edmond, near the University of Central Oklahoma campus and its forensic facilities. The bill did not include a Transition Coordinator position at that time, and that position was not a priority for either Senate President Pro Tem Glenn Coffee or House Speaker Chris Benge.


¶5 In late March or mid-April 2010, Leftwich told her friend Tom Jordan, Chief Administrative Officer for the Medical Examiner, that she would not run for reelection and wanted to come back to the Medical Examiner's office. She said that this was not public knowledge, and told Jordan that State Representative Mike Christian might run for her Senate seat. In March of 2010, Leftwich went to see Senate Pro Tem Coffee and told him she was considering not running for reelection; she did not mention returning to the Medical Examiner's office. On April 19, Leftwich told Senator Patrick Anderson, a Republican, that she was working on a deal with his leadership to go back to work for the Medical Examiner, but that she could not talk about it. Around May 1st Leftwich told Senator Charlie Laster, minority leader of the Senate Democrats, that she was not going to run; he was shocked because she was at that time raising money and, in his opinion, running for reelection. Laster asked Leftwich not to make a public announcement until he had time to recruit a candidate to run in her place. Leftwich did not tell him she had already talked to the Republican leadership. Polling showed that, while Leftwich was popular in her district, if she did not run the seat would probably go to a Republican candidate. At the time, the political balance of the Senate was very close and the Republican majority hoped to add Leftwich's Senate district.


¶6 Representative Terrill was subcommittee chair of the Appropriations and Budget Committee for Public Safety and the Judiciary. In this position he had authority over the budget of several state agencies, including the Oklahoma Bureau of Narcotics (OBN) and the Medical Examiner. Terrill was involved from the outset in the plan for Leftwich to leave the Senate and return to the Medical Examiner's office. Terrill originated the Transition Coordinator position; Tom Jordan did not ask for the position, but did not oppose it in principle. In late March or early April 2010, Terrill told Chad Alexander, a political consultant and lobbyist, that Leftwich might be returning to the Medical Examiner's office. On May 17, 2010, Terrill met with Jordan and Cherokee Ballard, an executive administrator and legislative liaison with the Medical Examiner's office. Before their conversation began, Terrill closed the door to his office suite and said, "This is dead man's talk." Terrill told Jordan and Ballard (a) that Jordan, as Chief Administrative Officer, would need to offer the Transition Coordinator position by July of that year, (b) the position needed to be filled the following January, and (c) that it would be a three-year position. Terrill told the two that Leftwich was ideally suited for the job. Leftwich was the only person Terrill mentioned in connection with the position. Terrill asked what Ballard's salary was, asked what Jordan's salary was, said they would "put Debbe in between", and settled on a salary of $80,000.00 per year. After that meeting, Ballard and Jordan agreed that the conversation didn't pass the smell test; they felt Jordan was being told to hire Leftwich for the Transition Coordinator position at $80,000.00 a year for three years, beginning the following January, without considering any other person for the job. While Jordan did not intend to offer the position to Leftwich, he allowed Terrill and Leftwich to think otherwise. After May 17, in discussions with Jordan, Leftwich routinely talked as if she would be returning to the Medical Examiner's office.


¶7 On May 19, Terrill met with Senator Anthony Sykes and Jennifer Lepard, a Senate staffer responsible for drafting the language of the conference committee version of SB 738. Terrill, reading from his own notes, gave Lepard the specific language for the amendment to SB 738 creating the Transition Coordinator position. This was the first time Lepard had heard of the position. The provisions Terrill dictated included a three-year fixed term with an $80,000.00 yearly salary, terminated only for cause, hired by the Chief Administrator but reporting to the Medical Examiner Board as well as the legislative and executive branches, an offer to be made by July 1, 2010, with the position to begin January 1, 2011. Several witnesses, including Lepard, testified it was highly unusual for a statute to include such specific employment details describing a lower-level agency position. Lepard and other witnesses also testified it was unusual for a Representative to dictate language to a Senate staffer to be inserted in a Senate bill. After this conversation, Leftwich joined the meeting and they discussed the general provisions of SB 738, but not the Transition Coordinator position.


¶8 State law prohibits legislators from taking a state position funded by appropriation for two years following their retirement from the legislature. In an earlier legislative session, Terrill had been instrumental in creating a revolving fund for the OBN, for money collected from a wire transfer fee. The fund grew to several million dollars, more than originally anticipated, and Director Weaver of the OBN understood that legislators might redirect that money and appropriate it for other agencies that were suffering under budget constraints. During the May 17 meeting, Jordan asked whether Leftwich, as a former legislator, would be prohibited from taking the job. Terrill explained the position would be paid from an Oklahoma Bureau of Narcotics revolving fund rather than appropriated funding; Terrill described this as his fund. When explaining the Transition Coordinator position in SB 738, Terrill told Rep. Marian Cooksey that the funding for the salary was coming from his own private "slush fund". During the last days of Session, Terrill asked Ken Miller, then a Representative and Chair of the House Appropriations Committee, for a spending bill which would appropriate extra money for the Medical Examiner's office, specifically for the Transition Coordinator position. Miller agreed, and the funding for the Transition Coordinator was included in a separate bill, HB 2486, which appropriated $90,000.00 from the OBN revolving fund and moved it to the Medical Examiner's office. Terrill told Senator Sykes that this money would pay for pathologists, and did not mention the Transition Coordinator position. After HB 2486 passed, Jordan was advised that, because the money from the OBN fund had been appropriated for the Medical Examiner's office, Leftwich could not legally retire from the Senate and take that position the following year.


¶9 Representative Mike Christian had decided to run for Leftwich's Senate seat. Christian recalled that Senate Pro Tem Coffee told him in early February 2010 that Leftwich might not run for reelection. Sometime in March, Leftwich approached Christian at the Capitol, said she had heard from a constituent about a telephone call polling her district voters which named the two of them as opposing candidates and, in tears, asked whether he was running against her. Another Senator told Christian that Leftwich was a nice lady and he shouldn't run against her. From these conversations, Christian believed Leftwich was running for reelection. Christian first heard about the Transition Coordinator position on April 26, 2010. At a party a week before Session ended, Christian told someone that Leftwich might go to the Medical Examiner's office and he would probably run for her seat. Shortly after that party, Terrill approached Christian and relayed the message that Leftwich wanted Christian to keep his mouth shut about her not running for reelection and instead going to the Medical Examiner's office. In the same time frame, Leftwich herself approached Christian and told him he needed to be quiet, because he was going to get her in trouble. Christian ultimately did not run for Leftwich's Senate seat, deciding that his candidacy would be harmed by the negative publicity from news reports of the investigation of this case. Christian was not charged in this case, and testified for the State.


¶10 In the last few days of Session, discussion and rumor surrounded SB 738 and its companion bill, HB 2486, which funded the Transition Coordinator position. During this time a lobbyist told Christian that Leftwich would be the Transition Coordinator. Senator Al McCaffrey, then a Representative, had refused to sign the conference committee version of the bill because he could not get information about the Transition Coordinator position. He was told after the bill passed that Leftwich would be the Transition Coordinator. On May 28, 2010, the last day of Session, Governor Henry visited the House and Senate to thank legislators for their work. McCaffrey told Henry that the Transition Coordinator position had been created for Leftwich, said he felt Leftwich was not qualified for the position, and asked Henry to veto the bill. Another legislator told Henry the same thing, adding that the position was created so Christian could run for Leftwich's seat.


¶11 During May, Jordan resigned as Chief Administrator for the Medical Examiner. On May 24, Jordan told his staff that he was resigning and that it looked like Leftwich would return to the Medical Examiner's office. Shortly after that day, Jordan told Terrill and Leftwich that he was leaving the Medical Examiner's office. He told Ballard, "Debbe was severely disappointed - effects [sic] her plan!" On May 27, after SB 738 passed, Terrill told Ballard that he needed to meet with Jordan. Although Jordan was still employed by the agency, he was using unexpired leave time and Ballard explained he was no longer in the office. Terrill insisted that Jordan had to do one more thing while he was still on the state's payroll. On June 2, 2010, Terrill and Leftwich met Jordan at the diner in the Warren Theater in Moore. Terrill told Jordan that he had an obligation to hire Leftwich for the Transition Coordinator position before July 1, although the Governor had not yet signed SB 738. Terrill said Jordan could act because passage of the bill constituted a legislative mandate. Terrill made a brief phone call to someone he described as a House staff lawyer, after which he told Jordan that he had the authority to fill the position by July 1, even though the Governor had not signed the bill. Jordan replied that he would ask for an opinion from the Assistant Attorney General assigned to the Medical Examiner's office, and follow her advice. Jordan called Sandra Balzer and told her a legislator was pressuring him to fill the Transition Coordinator position. Balzer advised him that he could not act on any provision of SB 738 until and unless the Governor signed it into law. Jordan took no further action.


¶12 Henry remembered the legislators' comments to him on the last day of Session when he considered the bills. He found no justification for the Transition Coordinator position, and vetoed both SB 738 and its funding bill, HB 2486, on June 6, 2010. Henry was also aware that a criminal investigation concerning the charges in this case had begun when he vetoed the bills.


¶13 Leftwich submitted a sworn affidavit as evidence in her bench trial. She admitted that she personally solicited, accepted, and expended funds in order to secure election in 2010 to Senate District 44, and allowed others to do so through her campaign committee. She admitted that she wanted the Transition Coordinator job, that she knew Terrill was promoting her for that job, and that taking the job was inconsistent with her running for reelection and remaining in the Senate. She conceded that she was a candidate as defined in 21 O.S.Supp.2004, § 187(4), and admitted that the record, including her affidavit and the evidence presented in the Terrill trial, was sufficient to support a finding of guilt.


¶14 In Proposition I Leftwich claims she was not a candidate for office. Leftwich was convicted of violating 26 O.S.2001, § 16-108, which provides, "Any person who shall solicit or accept from another anything of value for withdrawing from any political contest as a candidate or nominee for any office at any election shall be deemed guilty of a felony." Throughout these proceedings Leftwich vigorously claimed that she was never a candidate for election in 2010, never withdrew from a political contest, and thus could not be prosecuted under this statute. Leftwich filed a Motion to Quash on March 25, 2013, claiming she could not be prosecuted under § 16-108. The trial court denied the motion after a hearing on June 27, 2013. In so doing, the trial court found that Leftwich was a candidate for office. In Proposition I, Leftwich argues that this decision was error. This issue arises from the trial court's denial of Leftwich's motion to quash. However, the issue, which is one of first impression, turns on a question of statutory interpretation, and our review is de novo. State v. Tran, 2007 OK CR 39, ¶ 7, 172 P.3d 199, 200; Smith v. State, 2007 OK CR 16, ¶ 40, 157 P.3d 1155, 1169.


¶15 "The fundamental rule of statutory construction is to ascertain and give effect to the intention of the Legislature as expressed in the statute." Soto v. State, 2014 OK CR 2, ¶ 7, 326 P.3d 526, 527. When construing criminal statutes, we follow the rule of strict construction. Tran, 2007 OK CR 39, ¶ 8, 172 P.3d at 200. We will not, in order to justify prosecution of a person for an offense, enlarge a statute beyond the fair meaning of its language or what its terms justify. Id. We construe any criminal statute strictly against the State and liberally in favor of the accused. Id.; Fenimore v. State, 2003 OK CR 20, ¶ 5, 78 P.3d 549, 551. We give statutory language its plain and ordinary meaning. King v. State, 2008 OK CR 13, ¶ 7, 182 P.3d 842, 844; Tran, 2007 OK CR 39, ¶ 10, 172 P.3d at 200-01; 25 O.S.2011, § 1. To determine the legislature's intent, we begin with the statute itself, but may consider similar statutes, case law and dictionary definitions, the evil to be remedied, and the consequences of any particular interpretation. King, 2008 OK CR 13, ¶ 7, 182 P.3d at 844; see also State v. Anderson, 1998 OK CR 67, ¶ 3, 972 P.2d 32, 33; Lozoya v. State, 1996 OK CR 55, ¶ 20, 932 P.2d 22, 29. We construe statutes together, avoiding any interpretation which would render any part of them useless, superfluous or inconsistent, and will try to reconcile potentially conflicting provisions. State ex rel Mashburn v. Stice, 2012 OK CR 14, ¶ 11, 288 P.3d 247, 250; King, 2008 OK CR 13, ¶ 7, 182 P.3d at 844; Lozoya, 1996 OK CR 55, ¶ 17, 932 P.2d at 29. We presume that a statute enacted by the legislature is constitutional. Arganbright v. State, 2014 OK CR 5, ¶ 15, 328 P.3d 1212, 1216.


¶16 Leftwich claims the trial court incorrectly defined "candidate". Title 26 contains the Election Code. Leftwich argues that Title 26 exclusively defines "candidate" in the statute titled "Declarations of Candidacy Required": "A person may become a candidate for office and have his name appear on a ballot only after he files a Declaration of Candidacy as hereinafter provided." 26 O.S.2001, § 5-101. Leftwich uses § 5-101 to claim that "candidate", in Title 26, means only and exclusively a person who has filed a Declaration of Candidacy. We reject this interpretation of § 5-101. This section is found in Article V of Title 26, titled "Filing". It, and the other sections in Article V to which Leftwich refers, are descriptions of things candidates must do to file for election to office.[2] Specifically, § 5-101 describes the way in which a candidate is eligible to have her name appear on a ballot. Nothing in the plain language of that statute, or any other provision in Title 26, suggests that it is intended to provide a comprehensive definition of "candidate" for purposes of the Election Code or any prosecutions under that Code.


¶17 Leftwich relies on State v. Tran, supra. In Tran, this Court considered the definition of "vehicle" in Title 47, and its application to a specific statute, 47 O.S. § 10-102.1, which requires the driver of any vehicle involved in an accident to immediately stop and remain or return to the scene of the accident. The State sought to prosecute Tran under this statute for a fatality accident caused when a loveseat fell from his vehicle. Tran was aware of this but neither stopped nor retrieved the item, and another vehicle overturned while attempting to avoid the furniture on the roadway. This Court noted that Title 47 specifically defined "vehicle", and differentiated "vehicle" from a load carried by a vehicle. Tran, 2007 OK CR 39, ¶ 9, 172 P.3d at 200. Given that specificity the Court concluded that using strict construction, "vehicle" in § 10-102.1 could not be broadened to include a vehicle's cargo; this conclusion was supported by the plain and ordinary use of "vehicle", which did not include its load. Id. at ¶ 10, 172 P.3d at 200-01. Tran is easily distinguishable from the question of statutory interpretation at issue here. Tran is important not for where, or how, the word "load" was found within specific statutes found in Title 47. The point of Tran, here, is that Title 47 specifically defined "vehicle" in a general definitions provision intended to apply to all statutes within Title 47. The Court merely applied that statutory definition to a particular statute within Title 47. By contrast, Title 26 does not define the term "candidate". Therefore, we cannot, as we did in Tran, turn to a general definition found in Title 26 to conclude that Leftwich's conduct either includes or excludes her as a candidate under Title 26.


¶18 As Title 26 contains no comprehensive definition of "candidate", we turn to other sources. First, we look to the common and ordinary meaning of the word "candidate". Anderson, 1998 OK CR 67, ¶ 5, 972 P.2d at 34. Merriam-Webster defines "candidate" as "a person who is trying to be elected". Merriam-Webster Dictionary, www.merriam-webster.com (2015). Webster's New World Dictionary defines "candidate" as "a person who seeks, or who has been proposed for, an office, an award, etc." Webster's New World Dictionary 206 (2nd college ed. 1986). The term has no different meaning as a legal term of art; Black's Law Dictionary defines "candidate" as "One who seeks or offers himself, or is put forward by others, for an office, privilege, or honor." Black's Law Dictionary 187 (6th ed.). The conduct Leftwich admitted in her affidavit would make her a candidate under these definitions.


¶19 In consulting other sources, we also consider the purpose of the provision at issue, and look to other Oklahoma statutes with similar purposes and provisions. Owens v. State, 2010 OK CR 1, ¶ 8, 229 P.3d 1261, 1264; Coddington v. State, 2006 OK CR 34, ¶ 56, 142 P.3d 437, 452-53. The provision at issue is the one under which Leftwich was prosecuted, 26 O.S.2001 § 16-108, and its corresponding statute, § 16-107. Both statutes authorize prosecution for bribery which induces a candidate to withdraw from an election. In enacting the bribery statutes in the Election Code, the legislature sought to prevent anyone from subverting Oklahoma's political system, controlling a candidate's decision to run or withdraw from a race by corrupting that decision with an offer of personal gain. Title 21, chapter 5 of the Penal Code authorizes prosecution for crimes relating to elections and concerning candidates.[3] These crimes include betting on elections (21 O.S.2011, § 181), the making and communicating of unlawful offers by candidates (21 O.S.2011, §§ 182, 183), and limits on contributions to candidates (21 O.S.Supp.2008, § 187.1, 21 O.S.2001, § 187.2).


¶20 Title 21, Chapter 5, also includes a general definitions section. 21 O.S. 2001, § 187(4)[4] . The trial court properly looked to this provision in considering whether Leftwich was a candidate. Section 187 states:




4. "Candidate" means a person who seeks nomination or election to state or local office. An individual is a candidate when the individual:


a. has filed a declaration of candidacy for any state office with the Secretary of the State Election Board,


b. has filed a declaration of candidacy for any local office with the secretary of any county election board,


c. has filed a declaration of candidacy with the Secretary of State and has drawn active opposition,


d. is nominated as a "substitute candidate" pursuant to Section 1-105 of Title 26 of the Oklahoma Statutes, or


e. solicits or accepts contributions, makes expenditures or gives consent to an individual, organization, party committee, or other committee to solicit or accept contributions or make expenditures to secure election to any state or local office at any time, whether or not the office for which the individual will seek nomination or election is known when the:




(1) solicitation is made,


(2) contribution is accepted, or


(3) expenditure is made.




The term "candidate" shall include a person whose candidacy is unopposed.




This definition is consistent with the definition of "candidate" used by the Ethics Commission at the time of this crime. Rule 257: 1-1-2, Rules of the Ethics Commission, Title 74, Ch. 62, App. (Supp.2007). Leftwich admitted at trial that she was a candidate under this definition.


¶21 This definition is prefaced with the phrase, "As used in Sections 1 through 3 of this act". 21 O.S.2001, § 187. A footnote indicates that the phrase refers to Title 21, §§ 187-187.2. Leftwich argues, as she did below, that this phrase limits use of the definition in § 187 exclusively to cases brought under §§ 187, 187.1 or 187.2. This phrase cannot prevent this Court from considering this definition, as well as the definition in the Ethics Rules, when attempting to determine legislative intent. Our task is to decide what persons the legislature intended to be eligible for prosecution under 26 O.S. §§ 16-107 and 108. In the absence of a clear and unambiguous definition of "candidate" in Title 26, we not only may but must consider how the legislature has defined this term in statutes with similar purpose and circumstances. Owens, 2010 OK CR 1, ¶ 8, 229 P.3d at 1264-65 (considering definitions in Title 10A and Title 27A when interpreting a term in Title 21). This practice is not unusual. This Court routinely finds itself referring to Titles 10, 47 and 63, in addition to Title 21, in order to determine issues of criminal law.


¶22 Leftwich argues that the Ethics Code and campaign finance reporting laws serve a different purpose from the Election Code, and that applying the definition of "candidate" in Title 21, § 187 would render the Election Code provisions nonsense. On the contrary, it is Leftwich's contorted interpretation of the Election Code which results in confusion. Leftwich isolates specific sections of the Election Code, rather than reading them as a whole. For example, Article VI of Title 21, titled "Ballots", contains several provisions explaining the inclusion and order of names on ballots, the uses of separate ballots in various circumstances, and their printing and appearance. Section 6-201 of Title 26 states that unopposed candidates are deemed to have been elected, and their names will not appear on a ballot. 26 O.S.2011, § 6-102. Leftwich argues that this provision makes no sense under the Title 21, § 187 definition of "candidate". Leftwich misunderstands the plain language of the Election Code. First, the Code states that, to have her name appear on a ballot, a candidate must file a Declaration of Candidacy. 26 O.S.2011, § 5-101. No matter what a person has done to further her candidacy - filing with the Ethics Commission, raising or spending money, holding herself out as a candidate - she cannot get her name on a ballot unless she obeys that provision. If, after filing her Declaration of Candidacy, she is unopposed, she will be deemed to be elected and her name will not appear on the ballot. 26 O.S.2011, § 6-102. This statutory scheme is clear, unambiguous, and consistent.


¶23 Leftwich also claims use of this definition would render inconsistent provisions in Article VIII of the Election Code. Article VIII governs election certification and contests, including procedures for tie votes, and who may file and participate in election result contests or recounts. Again, a reading of the plain statutory language shows a consistent, clear, unambiguous progression. Before a candidate can be affected by a tie vote, her name must first be on a ballot. In order to be certified as a nominee, or if a candidate wants to contest an election result or demand a recount, her name must first be on a ballot. To be on a ballot, she must have filed a Declaration of Candidacy, no matter what other steps she has taken to further her candidacy.


¶24 Leftwich argues that, if the Title 21, § 187 definition of "candidate" applies to statutes in Title 26, it would render unnecessary the provision allowing for substitute candidates. Once again Leftwich's insistence on reading the statutes in isolation defeats her argument. Article I of the Election Code governs political parties and their nominees. If a political party nominee for office dies before the date of the general election, the party may place a substitute candidate on the ballot by following specific provisions. 26 O.S.2011, § 1-105. Leftwich argues that this provision makes no sense if there are "multiple ways a person could become a candidate." Leftwich improperly frames the question. As discussed above, no matter how many ways there are to be considered a candidate, the only way to get on a ballot is to file a Declaration of Candidacy. The plain language of § 1-105 requires that (a) a party candidate must already have filed a Declaration of Candidacy and (b) must already be on the ballot. Section 1-105 sets out the way a political party's substitute candidate may get on a ballot, if the party candidate already on the ballot dies before the election. Section 1-105 remains necessary, and is consistent with the other provisions of Title 26, using the definition of "candidate" used by the trial court.


¶25 We interpret the statutes in Title 26 together, using their plain language. King, 2008 OK CR 13, ¶ 7, 182 P.3d at 844. The absurdities and inconsistencies Leftwich alleges would occur, if "candidate" is defined consistent with Title 21, § 187 and the Ethics Code, simply do not exist.


¶26 Leftwich also argues that legal conduct could be criminalized if Title 26, § 16-108 does not exclusively apply to someone who has filed a Declaration of Candidacy. She argues that, if the trial court's decision is correct, a sitting Representative who received a contribution to run for a higher office, rather than reelection, could be prosecuted under Title 26, § 16-108. She argues that if the Representative were offered a job in the private sector, which "induces" her not to run for reelection, she would commit a crime by taking the job. These examples, like others Leftwich offered before the trial court, fail to take into account the key language in § 16-108 and its counterpart, § 16-107. Under the statute, the thing of value must be offered, solicited or accepted for withdrawing from any political contest as a candidate or nominee or any office at any election. 26 O.S.2001, § 16-108 (emphasis added). If the hypothetical Representative - after she has met the definition of "candidate" in Title 21, § 187 - is offered a contribution to run for a different office, withdrawal from reelection for her current office may be a necessary consequence of her decision to accept the contribution and run for a different office. If she is offered a job in the private sector, she might choose to take it rather than run for reelection. However, in either case, no crime would be committed under §§ 16-107 and 16-108 unless the original offer was made, solicited, or accepted, to cause the Representative to withdraw from the contest for which she was then a candidate. Furthermore, if the Representative was not yet a candidate for reelection at the time of either offer, there would be no crime at all.


¶27 A Declaration of Candidacy can be filed with the Secretary of State only during the three-day filing period. In 2010, the filing period ran from the third Monday in June to the following Wednesday. 26 O.S.Supp.2004, § 5-110. Under Leftwich's interpretation of Title 26, a person could create a candidate committee with the Ethics Commission, and could actively raise and expend funds towards an election campaign, and yet, if the filing period had not yet begun, not be a "candidate" for election. This is inconsistent with the legislature's treatment of candidates in other statutes and with the Ethics Commission's treatment of candidates for office.


¶28 Like the trial court, we find that a candidate for purposes of Title 26, §§ 16-107 and 108 is properly described by the definition in Title 21, § 187, and the Ethics Code. Leftwich herself admits that she was a candidate under that definition. This proposition is denied.


¶29 In Proposition II Leftwich claims the State failed to show she withdrew from a political contest, and thus she committed no crime under § 16-108. Title 26 contains no specific definition of "withdraw" or withdrawal. However, Title 26, § 5-115 provides that, to withdraw from a primary election, a candidate who has filed a Declaration of Candidacy with the Secretary of State must file a written notice of withdrawal with the Secretary of State; the notice must be filed on or before 5:00 p.m. on the second business day following the close of the filing period. 26 O.S.Supp.2004 5-115. Leftwich argues, as she did at trial, that this provision exclusively defines withdrawal from candidacy and her actions did not fall within that definition. The trial court rejected this argument, noting that this provision did not constitute the only way a candidate could withdraw from a race.


¶30 We review this question of statutory interpretation de novo. Tran, 2007 OK CR 39, ¶ 7, 172 P.3d at 200. We must reconcile statutory provisions, giving each part effect. Mashburn, 2012 OK CR 14, ¶ 11, 288 P.3d at 250. Looking at Article V of Title 26, which governs filing for and withdrawal from candidacy, we find not one, but three statutory provisions concerning withdrawal. In addition to § 5-115, which Leftwich argues contains the exclusive definition of withdrawal, we find §§ 5-116 and 5-116.1. Section 5-116 provides that candidates who wish to withdraw from a runoff primary election must file written notice on or before 5:00 p.m. on the Friday following the primary election. 26 O.S.Supp.2003, § 5-116. Section 5-116.1 provides that, to withdraw from a general election, a candidate must file written notice on or before 5:00 p.m. on the Friday following the runoff primary election. 26 O.S.Supp.2001, § 5-116.1. The Election Code provides not one, but three ways in which a candidate who has filed a Declaration of Candidacy during the filing period - that is, a candidate who is eligible to be on a ballot - may withdraw from the race, ensuring that her name will not be on the ballot. The existence of three separate statutes concerning withdrawal compels us to conclude (as did the trial court) that § 5-115 does not contain the exclusive means for withdrawing from a political contest.


¶31 Leftwich's larger point appears to be that, for purposes of every statute within the Election Code, the only way to withdraw from a political contest is to file a notice of withdrawal with the secretary of the election board which accepted the candidate's declaration of candidacy - the common element among §§ 5-115, 5-116, and 5-116.1. Taken together, these provisions certainly state that, if a person has filed a Declaration of Candidacy and is eligible to be on the ballot, filing such a notice is the only way to withdraw. However, we found in Proposition I that the term "candidate", for purposes of Title 26, §§ 16-107 and 108, is more expansive than merely a person who has filed a Declaration of Candidacy. Long before the filing period begins, a candidate may, for example, raise and spend money, hold herself out publicly as a candidate, or file with the Ethics Commission. Such a person, wishing to withdraw as a candidate, could not file a notice of withdrawal under the Election Code provisions. However, she could announce that she would not run for election; she could, as Leftwich admits, choose not to file a Declaration of Candidacy, thus announcing by her actions that she would not be on the ballot, and thus not be running for election.


¶32 We also look to the purpose of the statutes, the evil to be remedied, and the consequences of a particular interpretation. King, 2008 OK CR 13, ¶ 7, 182 P.3d at 844; Anderson, 1998 OK CR 67, ¶ 3, 972 P.2d at 33; Lozoya, 1996 OK CR 55, ¶ 20, 932 P.2d at 29. We found in Proposition I that the bribery statutes were intended to prevent subversion of Oklahoma's political system by corrupting a candidate's decision to run or withdraw from a political race with an offer of personal gain. Ample evidence at trial showed that candidates begin the process of fundraising, spending, and seeking publicity months, or even years, before the filing period for an election.


¶33 Leftwich's restrictive interpretation of Title 26 does not serve this comprehensive purpose. A Declaration of Candidacy can only be filed with the Secretary of State during the three-day filing period. In 2010, the filing period ran from the third Monday in June to the following Wednesday. 26 O.S.Supp.2004, § 5-110. Leftwich, relying on § 5-115, argues that a candidate who has filed a Declaration of Candidacy may only withdraw from a race by filing a written notice of withdrawal on or before 5:00 p.m. on the second business day following the close of the filing period. 26 O.S.Supp.2004 5-115. Leftwich's argument leads to an absurd result. Under Leftwich's interpretation of Title 26, a person may only be prosecuted under §§ 16-107 and 16-108 if the candidate in question (a) filed a Declaration of Candidacy within the three-day filing period and (b) filed a written notice withdrawing as a candidate within two business days after the close of the filing period. In 2010, this would have resulted in a five-day period, from the Monday filing began through close of business Friday, two days after the filing period ended. In other words, Leftwich asks this Court to conclude that §§ 16-107 and § 16-108 applied, in 2010, for only five days, to her or any other candidate. Looking at the Election Code as a whole, and at the specific provisions of §§ 16-107 and 16-108, we reject the suggestion that this result is what the legislature intended.


¶34 In arguing that she is not eligible for prosecution under § 16-108, Leftwich asks this Court to disregard every action she took from 2007 through May 28, 2010, furthering her candidacy for Senate District 44. She asks this Court to disregard the testimony that any candidate (and especially a candidate for state Senate) begins her campaign long before the filing period, by actions including raising money, polling, and seeking name recognition. She asks this Court to disregard the fact that, as soon as a person has raised $500.00 (for the 2010 campaign cycle) towards a campaign, the Ethics Commission requires her to file, create a candidate committee, and follow strict reporting requirements regarding that money - in fact, considers her to be a candidate even if she never files a Declaration of Candidacy with the Secretary of State.


¶35 We conclude that the term "withdraw" in §§ 16-107 and 16-108 is not exclusively confined to filing a notice of withdrawal of candidacy. A candidate who has not yet filed a Declaration of Candidacy may, by her actions, withdraw from a race. We need not, here, decide precisely which actions must constitute withdrawal in every case. Leftwich admitted at trial that she was a candidate within the definition of Title 21, § 187, and we found in Proposition I that that definition applies to Title 26, § 16-108. Leftwich publicly announced on May 28, 2010, that she would not run for reelection in 2010. This announcement certainly satisfies the element that Leftwich withdraw from her Senate race. This proposition is denied.


¶36 In Proposition III Leftwich argues that the notice requirement of due process requires reversal. She claims that she could not have understood she would be considered a candidate for office in 2010 for purposes of Title 26, based on the language of § 16-108 and her actions. She argues that, if "candidate" in § 16-108 is defined as it is in Title 21, § 187, then § 16-108 is void for vagueness. She also argues that her prosecution was arbitrary and the result of unfettered discretion. Leftwich raised this claim before preliminary hearing, and again in her Motion to Quash, which the trial court denied on June 27, 2013.


¶37 We review a claim concerning the constitutionality of a statute de novo. Murphy v. State, 2012 OK CR 8, ¶ 30, 281 P.2d 1283, 1292. Any crime must be set out so that a person of ordinary intelligence can understand what conduct is prohibited, and in a way that does not encourage arbitrary enforcement. State v. Saunders, 1994 OK CR 76, ¶ 5, 886 P.2d 496, 497; Bouie v. City of Columbia, 378 U.S. 347, 350-51, 84 S.Ct 1697, 1701, 12 L.Ed.2d 894 (1964). A statute which fails this test does not give fair notice of prohibited conduct. Brumfield v. State, 2007 OK CR 10, ¶ 19, 155 P.3d 826, 834-35. A person must not be forced to guess or speculate as to whether her conduct is eligible for prosecution. Hayes v. Municipal Court of Oklahoma City, 1971 OK CR 274, ¶ 6, 487 P.2d 974, 976. A statute is not vague if reasonable people would know their conduct is at risk. Allen v. City of Oklahoma City, 1998 OK CR 42, ¶ 6, 965 P.2d 387, 390.


¶38 Leftwich argues that the trial court's adoption of the definition of "candidate" found in Title 21, § 187, unforeseeably and retroactively expanded § 16-108 beyond the narrow and precise language of the statute. She relies on Bouie, in which protesters at a lunch counter, who had never been warned not to enter the premises, were asked to leave, refused, and were prosecuted for trespassing. The United States Supreme Court overturned the convictions, finding that the judicial construction of the trespassing statute expanded it beyond its narrow, plain meaning, and subjected the defendants to prosecution for acts that were not crimes when they were committed. Bouie, 378 U.S. at 355-56, 84 S.Ct at 1703. She also relies on Douglas v. Buder, in which that Court reversed a probation revocation where the petitioner, required to report any arrest, failed to immediately report receiving a traffic citation. Douglas v. Buder, 412 U.S. 430, 431-32, 93 S.Ct. 2199, 2200-01, 37 L.Ed.2d 52 (1973). The Court applied Bouie and found that the trial court unforeseeably expanded "arrest" to include traffic citations, depriving Douglas of due process. Id. She also refers to Powers v. Owen, 1966 OK CR 141, 419 P.2d 277. There, this Court reversed a conviction for shooting a protected game bird, as defined by Congress, in which the bird in question was only defined as a game bird by treaty. We found that the statute meant what it said and the legislature did not intend to incorporate treaties between the United States and foreign powers, and noted that citizens are not required to research Oklahoma statutes, federal law, and treaties in order to determine whether their actions constitute a crime. Owen, 1966 OK CR 141, ¶¶ 4, 9, 491 P.2d at 279.


¶39 None of these cases apply here. Leftwich's claim relies completely on her assertion that "candidate" is exclusively defined for Title 26 in 26 O.S.2001, § 5-101. We rejected this claim in Proposition I, showing that it cannot be sustained using basic principles of statutory interpretation. She also argues that the trial court expanded the meaning of "withdraw". We rejected this claim in Proposition II, again showing that the statutes simply do not support that interpretation. Nothing in the language of the Election Code itself, or in case law, suggests that Leftwich's extremely restrictive interpretation of § 16-108 was (a) intended by the legislature or (b) was the common understanding of persons seeking election at the time this crime was committed, or since. Leftwich fails to show, as a matter of law, that application of the definition found in Title 21, § 187 was unforeseeable or expanded the plain language of § 16-108.


¶40 Leftwich's claim, that she had no notice she was a candidate accepting a bribe to withdraw from her race, is also wholly unsupported by her own actions and the testimony. In 2007, Leftwich filed a statement of candidacy for the 2010 election cycle with the Ethics Commission and created a candidate committee for her reelection to her Senate seat. During the next three years she raised and spent money as part of her campaign for reelection. Under Ethics Commission rules she was considered a candidate as soon as she formed her candidate committee. Otherwise, as the former executive director of the Ethics Commission testified, "if you waited until [the filing period opened], a candidate could spend a great sum of money and collect a great sum of money without the public being aware of where that money came from or where it was going." Leftwich was an experienced legislator in 2010. Nothing in the testimony suggests Leftwich was unaware of or misunderstood the Ethics Commission rules, and her actions show she was careful to follow those rules. Senator Charlie Laster, then head of the Senate PAC, which raised money for state Senate candidates, testified that commonly, Senate candidates were recruited at least a year in advance of the filing period. Other witnesses testified that Leftwich gave every indication of running for office throughout the 2010 legislative session - she solicited money, attended fundraisers, spoke as if she were running, and did not correct people who talked as if she were running for reelection. Leftwich herself admitted those actions. In addition, the record does not support Leftwich's claim that the State's theory of the case changed. Throughout the course of this prosecution the State consistently argued that Lefwich had accepted a bribe from Terrill by expressing her intention to return to the Medical Examiner's office and announcing her decision not to run for reelection.


¶41 Leftwich also argues that the trial court's interpretation of the statute encouraged unfettered discretion and arbitrary prosecution. Nothing in the record supports this claim. Testimony showed that legislators commonly have an open campaign account with the Ethics Commission throughout their terms of office, and are considered "candidates" by the Ethics Commission until that account is closed. Given this, Leftwich argues, no legislator could accept an offer of a full-time job during their term of office. This is nonsense. As we discuss in Proposition I, §§ 16-107 and 16-108 prohibit offering, soliciting or accepting a job to induce or cause a candidate to withdraw from a race. The evidence here supported that charge. A mere job offer is unlikely to support such a prosecution.


¶42 Application of the definition of "candidate in Title 21, § 187, to Title 26, § 16-108, does not render the statute unconstitutional. A reasonable person would understand what conduct was prohibited, and need not guess whether the statute applied to her conduct. Allen, 1998 OK CR 42, ¶ 6, 965 P.2d at 390. Leftwich was not denied due process, and this proposition is denied.


¶43 Leftwich has filed a request for oral argument. Because both parties thoroughly briefed the questions of law at issue here, this request is denied.


DECISION


¶44 The Judgment and Sentence of the District Court of Oklahoma County is AFFIRMED. The request for oral argument is DENIED. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2015), the MANDATE is ORDERED issued upon the delivery and filing of this decision.


AN APPEAL FROM THE DISTRICT COURT OF OKLAHOMA COUNTY
THE HONORABLE CINDY TRUONG, DISTRICT JUDGE




 


 



 
 

 

 
ATTORNEYS AT TRIAL

 
ROBERT G. McCAMPBELL
 TRAVIS V. JETT
 FELLERS SNIDER
 A PROFESSIONAL CORPORATION
 100 NORTH BROADWAY, STE. 1700
 OKLAHOMA CITY, OK 73102
 COUNSEL FOR DEFENDANT

 
 

 
GAYLAND GIEGER
 JIMMY HARMON
 ASSISTANT DISTRICT ATTORNEYS
 OKLAHOMA COUNTY DISTRICT
 ATTORNEY'S OFFICE
 310 ROBERT S. KERR AVE., STE. 505
 OKLAHOMA CITY, OK 73102
 COUNSEL FOR STATE
 
 

 
ATTORNEYS ON APPEAL

 

 ROBERT G. McCAMPBELL
 TRAVIS V. JETT
 FELLERS SNIDER
 A PROFESSIONAL CORPORATION
 100 NORTH BROADWAY, STE. 1700
 OKLAHOMA CITY, OK 73102
 COUNSEL FOR APPELLANT

 
 

 
E. SCOTT PRUITT
 ATTORNEY GENERAL OF OKLAHOMA
 JENNIFER B. WELCH
 ASSISTANT ATTORNEY GENERAL
 313 NE 21 ST STREET
 OKLAHOMA CITY, OK 73105
 COUNSEL FOR APPELLEE
 
 
 





OPINION BY: Smith, P.J.
Lumpkin, V.P.J.: CONCUR
A. Johnson, J.: CONCUR
Lewis, J.: CONCUR





FOOTNOTES




[1] Leftwich's co-defendant, Randall Terrill, was charged in Count I with the same offense. The trials were severed. In her bench trial, Leftwich relied on the transcript testimony and evidence presented in Terrill's jury trial. Terrill was convicted and appealed separately in Terrill v. State, No. F-2013-1169. This Court granted Leftwich's request to cross-reference the appeal records in this case, F-2013-1156, and Terrill's case, F-2013-1169.





[2] These include the procedures for filing with the state and county election boards (26 O.S.2011, §§ 5-102, 5-103); how to file, provisions concerning candidate names, and what information is required (26 O.S.2011, §§ 5-104, 5-105, 5-106, 5-107, 5-108, 5-109, 5-110, 5-111, 5-112, 5-114); and substitution of candidates on a ballot (26 O.S.Supp.2009, § 1-105(A).





[3] For this reason, similarity of purpose, Title 21 is the logical and appropriate first place to look when attempting to discern legislative intent. Leftwich offers several other examples of definitions of "candidate" found throughout the Oklahoma Statutes, but admits that none of them would apply to Leftwich, because none are similar in circumstance or purpose.





[4] This is the definition in effect at the time the crime was committed and Leftwich and Terrill were charged. The definition of "candidate" in § 187 was amended in 2014, effective January 1, 2015. Section 187 currently defines "candidate": "Candidate' means an individual who has filed or should have filed a statement of organization for a candidate committee for state office with the Ethics Commission as required by its Rules. A candidate committee shall include committees for candidates for partisan elective offices, for nonpartisan judicial offices and for judicial retention offices." 21 O.S.Supp.2014, § 187(2).









 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 1994 OK CR 76, 886 P.2d 496, STATE v. SAUNDERS
Discussed
 1996 OK CR 55, 932 P.2d 22, Benjamin Lozoya v. State
Discussed at Length
 2003 OK CR 20, 78 P.3d 549, FENIMORE v. STATE
Discussed
 2006 OK CR 34, 142 P.3d 437, CODDINGTON v. STATE
Discussed
 2007 OK CR 10, 155 P.3d 826, BRUMFIELD v. STATE
Discussed
 2007 OK CR 16, 157 P.3d 1155, SMITH v. STATE
Discussed
 2007 OK CR 39, 172 P.3d 199, STATE v. TRAN
Discussed at Length
 2008 OK CR 13, 182 P.3d 842, KING v. STATE
Discussed at Length
 2010 OK CR 1, 229 P.3d 1261, OWENS v. STATE
Discussed at Length
 2012 OK CR 8, 281 P.3d 1283, MURPHY v. STATE
Cited
 2012 OK CR 14, 288 P.3d 247, STATE v. STICE
Discussed at Length
 2014 OK CR 2, 326 P.3d 526, SOTO v. STATE
Discussed
 2014 OK CR 5, 328 P.3d 1212, ARGANBRIGHT v. STATE
Discussed
 1966 OK CR 141, 419 P.2d 277, POWERS v. OWEN
Discussed at Length
 1971 OK CR 274, 487 P.2d 974, HAYES v. MUNICIPAL COURT OF OKLAHOMA CITY
Discussed
 1998 OK CR 42, 965 P.2d 387, 69 OBJ 2520, Allen v. Oklahoma City
Discussed at Length
 1998 OK CR 67, 972 P.2d 32, 70 OBJ 789, State v. Anderson
Discussed at Length
Title 21. Crimes and Punishments
 Cite
Name
Level

 21 O.S. 181, Betting or Wagering on Elections
Cited
 21 O.S. 182, Unlawful Offers by Election Candidates
Cited
 21 O.S. 187, Definitions
Discussed at Length
 21 O.S. 187.1, Limits on Contributions to Candidates - Exemption - Contributions by Intermediary - Penalty
Cited
 21 O.S. 187.2, Contributions by Corporation Prohibited - Exceptions - Penalty
Cited
Title 25. Definitions and General Provisions
 Cite
Name
Level

 25 O.S. 1, Meaning of Words
Cited
Title 26. Elections
 Cite
Name
Level

 26 O.S. 5-116, Withdrawals From Runoff Primary
Cited
 26 O.S. 5-110, Filing Period
Discussed
 26 O.S. 1-105, Substitute Candidates
Discussed
 26 O.S. 5-101, Declarations of Candidacy Required
Discussed at Length
 26 O.S. 5-102, Candidates Filing With Secretary of State Election Board
Cited
 26 O.S. 5-104, Party Must Be Recognized
Cited
 26 O.S. 6-102, Unopposed Candidates
Discussed
 26 O.S. 16-107, Bribe for Withdrawal of Candidacy
Cited
 26 O.S. 16-108, Acceptance of Bribe for Withdrawal
Discussed at Length